IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 29, 2022 Session

## STATE OF TENNESSEE v. LESA ANNETTE WHITE MCCULLOCH

**Appeal from the Criminal Court for Monroe County**
**No. 16-010CRM    Sandra N.C. Donaghy, Judge**

_____

### No. E2021-00404-CCA-R3-CD

_____

The Defendant, Lesa Annette White McCulloch, appeals her convictions for one count of initiating the manufacture of methamphetamine, three counts of simple possession of a controlled substance, one count of possession of marijuana with the intent to sell, and one count of possession of unlawful drug paraphernalia, and her resulting sixteen-year sentence. The Defendant argues that (1) the trial court erred by denying the Defendant's motion to suppress the evidence seized as a result of the search of the Defendant's home; (2) the trial court erred by denying the Defendant's motion to dismiss for the State's failure to preserve material evidence and by declining to issue a special jury instruction; (3) the trial court erred by failing to instruct the jury on the lesser-included offense of facilitation of possession of marijuana with the intent to sell; (4) the trial court erred by admitting evidence of the Defendant's prior bad acts; (5) the State committed prosecutorial misconduct during closing arguments by commenting on the Defendant's intelligence; (6) the evidence was insufficient to support her convictions; and (7) the trial court erred in determining her sentencing range and by ordering partial consecutive sentencing. Following our review, we affirm; however, we remand the case for entry of a corrected judgment in Count 1 due to a clerical error.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Lesa Annette White McCulloch.

Herbert H. Slatery III, Attorney General and Reporter; T. Jonathan H. Wardle, Assistant Attorney General; Stephen D. Crump, District Attorney General; Ashley M. Ervin (at

pretrial motion hearings), and Shari L. Tayloe and Matthew L. Dunn (at trial), Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On July 6, 2015, members of the Madisonville Police Department (MPD) and Monroe County Sheriff's Office (MCSO) initiated a knock and talk interaction at the Defendant's trailer. After the Defendant consented to a search for evidence of methamphetamine manufacture, the officers found materials and equipment used to manufacture methamphetamine, and a subsequent search of the Defendant's purse yielded two baggies of marijuana, forty pseudoephedrine pills, eleven alprazolam pills, nine hydrocodone pills, and an oxycodone pill.

The January 2016 term of the Monroe County Grand Jury charged the Defendant with the following offenses: initiation of methamphetamine manufacture (Count 1); possession of hydrocodone, a Schedule II controlled substance (Count 2); possession of oxycodone, a Schedule II controlled substance (Count 3); possession of alprazolam, a Schedule IV controlled substance (Count 4); possession of marijuana, a Schedule VI controlled substance, in an amount of more than 0.5 ounces but less than ten pounds with the intent to sell or deliver[1] (Count 5); and possession of unlawful drug paraphernalia (Count 6). See Tenn. Code Ann. §§ 39-17-408, -17-412, -17-415, -17-417, -17-418, -17-425, -17-435.

At trial, MPD Detective David Wear, MCSO Deputy Denny Graham, and MPD Sergeant Daniel Dockery testified regarding the circumstances of the July 6, 2015 search and its outcome. At the time of the incident in this case, Detective Wear had recently been promoted and had been working drug cases for about two weeks. At 10:30 p.m., the three officers and two MPD patrol officers drove to the Defendant's one bedroom, one bathroom single-wide trailer. They encountered the Defendant's live-in boyfriend, David Jacobs, who was working on a car in the driveway. Detective Wear asked him if the Defendant was home, and Mr. Jacobs went inside to get her. Detective Wear did not recall if Mr. Jacobs told him that the Defendant was asleep.

Detective Wear and Deputy Graham testified that they stood on the small front porch and that Detective Wear spoke with the Defendant through the open front doorway. Sergeant Dockery stood in the yard and did not hear the conversation. Although neither Detective Wear nor Deputy Graham recalled the exact wording of the exchange, Detective

---

[1] At trial, the State elected to pursue only the sale portion of Count 5, and the delivery portion was not sent to the jury.

Wear stated that he asked the Defendant for consent to search the trailer for "any active meth labs and/or any items used in the manufacture of methamphetamine." Deputy Graham stated that Detective Wear discussed with the Defendant "their activity that had been going on at the residence." The officers agreed that the Defendant gave verbal consent to search; although Detective Wear said that he probably had a consent to search form in his truck, he did not have the Defendant provide written consent. Detective Wear noted that he was not required to obtain written consent to search and that he asked the Defendant for consent because he knew her to be the main tenant or owner of the trailer. None of the officers were equipped with body cameras, and because none of the police cruisers had their lights activated, no dashboard cameras recorded the relevant events.

The Defendant's trailer consisted of a living area partitioned by a bar style counter into the living room and kitchen, a bathroom, and a bedroom. The relevant items in this case were all found in the living room, kitchen, and bathroom. The living room contained a black sofa, a coffee table, and a beige recliner.

Detective Wear, Deputy Graham, and Sergeant Dockery conducted the search. Within minutes of entering the living room, the officers found a spent or inactive "one-pot meth lab," which consisted of a small soda bottle underneath a coffee table, at which point the Defendant was removed from the trailer for her safety. The Defendant and Mr. Jacobs were the only people in the trailer.

The quality and number of crime scene photographs was addressed several times during trial. Detective Wear was the only officer who took photographs, and he attributed any deficiencies in the photographs or crime scene documentation to his relative inexperience with drug investigations at the time. The officers generally acknowledged that they had moved some items to photograph them, although no one could provide detail other than that they moved the coffee table away from the couch before they found the meth lab. Even so, the coffee table was pictured within arm's reach of the couch. They similarly agreed that not all of the evidence was photographed.

The meth lab was originally found on its side, but the officers stood the bottle upright for photographs. In addition, Sergeant Dockery was photographed holding the bottle while wearing gloves before he took it outside. The meth lab contained a dark material and a white crystalline residue, which were identified as lithium strips from batteries and ammonium nitrate[2] from cold packs, respectively. The officers all noted that a spent meth lab had completed the chemical reaction necessary to produce methamphetamine oil, of which there was none remaining in the bottle.

---

[2] Sergeant Dockery also noted that sodium hydroxide, a binder in pseudoephedrine pills, could have been present in the white residue.

The testimony and photographs established that on the coffee table, the officers found digital scales containing a white powder and a "leafy" residue, two unopened cold packs, a funnel, coffee filters, a small pink bag,[3] a small purple and pink striped bag, "burnt" aluminum foil, an unused roll of aluminum foil, pliers, and a pill crusher. One of the coffee filters had a math equation written in pencil on it, which Detective Wear identified as quantities commonly associated with methamphetamine use. A letter addressed to Mr. Jacobs was also on the coffee table. A pack of razor blades, plastic baggies, and an extension cord were sitting on the beige recliner.

The small striped bag contained pens, a straw used to ingest narcotics, a health card and prescription savings card in two different women's names who were not the Defendant, and a credit card. The small pink bag contained corner-cut baggies, a pen, a flashlight, razor blades, small scissors, coffee filters, and three glass smoking pipes. A third pink bag, which was not pictured on the coffee table, contained coffee filters; Detective Wear noted that he found three glass methamphetamine pipes wrapped in the filters.[4]

Among a variety of items strewn across the carpet, the officers found baggies, empty boxes of allergy medication containing pseudoephedrine, another pair of pliers, and metallic detritus, some of which was attributed to batteries having been opened in order to access lithium strips. A plastic shopping bag held plastic bottle caps and a quantity of green plastic tubing. Detective Wear stated that the bottle caps and tubing were used in "the gassing process." "[O]pened" lithium batteries and an emptied cold pack were in a garbage can, and camp fuel and three bottles of lye, one of which had been opened, were in shopping bags on the floor.

In the kitchen, a square blue Pyrex dish, two open glass mason jars, and a funnel with a coffee filter fitted inside it were on the stovetop. One of the glass jars contained a clear liquid identified by Sergeant Dockery as camp fuel. A hairdryer was plugged in on the countertop; Detective Wear testified that in the gassing process, the methamphetamine solids were filtered using a funnel and coffee filter and that typically, a hair dryer could be used to dry the strained solids. He also stated that in the kitchen, he saw a coffee grinder "that [was] used to grind up pseudoephedrine pills" and an open box of pseudoephedrine.

---

[3] The small bags appeared to be the type commonly used to hold makeup or school supplies.

[4] Several of the items of drug paraphernalia were introduced as exhibits at trial, including sandwich baggies, the glass pipes, corner-cut baggies, an empty "jewelry bag" containing marijuana residue, the digital scales, razor blades, a pink camera case containing a marker, a pill case, a "roach clip," and an unlabeled green pill bottle.

A photograph from the bar area of the kitchen showed a box of "Zephrex-D" gel capsule allergy medication, which contained a symbol indicating that it could not be used to make methamphetamine. Detective Wear noted that none of the pseudoephedrine pills recovered from the Defendant's purse were gel capsules.

The Defendant's bathroom contained a standing oscillating fan pointing toward the partially open shower curtain, lighter fluid, and a pair of scissors; a window inside the shower area was open and had a screen hanging crookedly from it. Detective Wear and Sergeant Dockery explained that the gassing process produced hazardous fumes and that ventilation was important. A "beer bottle gasser" was also found in the bathroom near the bottom of the fan, but it was not photographed. Sergeant Dockery explained that the gassing process involved the release of hydrogen chloride gas and that ventilation was important. He stated that the hydrogen chloride and ammonia involved in an active meth lab had strong smells, and Detective Wear noted that he did not detect these smells when approaching the Defendant's trailer.

Detective Wear stated that he collected a composition notebook[5] labeled as "Lesa's sh-t book"; although he could not recall where in the trailer he found it, he affirmed that it came from the trailer. He identified a page from the book, which contained individuals' names, telephone numbers, and a series of numbers, some of which were preceded by dollar signs.[6] When asked whether he had personal knowledge about whether the notebook referred to drugs or maintaining the Defendant's garden, Detective Wear stated, "Well, I can tell you that the names in the ledger book[,] at the same timeframe I was dealing with the same people referenced in illegal drug activity." Detective Wear agreed that some of the notebook entries referred to ladies clothing, light bulbs, and gardening supplies. Sergeant Dockery testified that the presence of corner-cut baggies, digital scales, scissors, and the composition notebook indicated illegal drug distribution.

Detective Wear testified that an open red purse near the couch was not photographed and that he saw marijuana "in plain view . . . from the point of it being opened." The officers took the purse outside and searched it on the hood of a police cruiser truck with the Defendant present. In the purse, officers found two similarly-sized baggies of marijuana, eleven alprazolam pills, nine hydrocodone pills, one oxycodone pill, a baggie with thirty pseudoephedrine pills, and a baggie of ten pseudoephedrine pills. The officers did not photograph the Defendant's purse or its contents, but the pills were sent to the Tennessee Bureau of Investigation (TBI) for analysis. The purse itself was not collected as evidence and was returned to the Defendant or her mother.

---

[5] The witnesses also referred to the notebook as a ledger book.

[6] The notebook page was published to the jury, but it was not included in the appellate record.

Detective Wear testified that after reading the Defendant her <u>Miranda</u> rights, she acknowledged ownership of the purse, admitted having bought the cold packs and marijuana, and stated that she purchased the lye as a drain cleaner because of a plumbing problem. The Defendant claimed that while she was asleep on the sofa, someone had come into her home and planted the meth lab underneath the coffee table.

Sergeant Dockery was certified as an expert in methamphetamine investigation and explained the manufacturing process, including household substances used to make methamphetamine like pseudoephedrine, ammonium nitrate, lithium batteries, lye, camping fuel, lighter fluid, mason jars, plastic tubing, coffee filters, and twenty or thirty-two-ounce plastic bottles. He stated that all the necessary components to manufacture methamphetamine were present in the Defendant's trailer aside from the methamphetamine oil and a solvent, which he theorized was the camp fuel in the mason jar.

The officers testified that although the active manufacturing process had concluded, the remaining substances in the meth lab were volatile and hazardous such that they could not be tested or retained as evidence. Sergeant Dockery and Detective Wear stated that the spent meth lab, lye, unused cold packs, plastic tubing, pliers, camp fuel, Pyrex dish, funnel, and mason jars were destroyed, which was standard practice. In addition, the coffee filters, pliers, scissors, and empty pseudoephedrine boxes were collected as trash and destroyed because they had been used to manufacture methamphetamine. Detective Wear said that although an empty box of pseudoephedrine was not dangerous, "it could be hazardous."

Detective Wear, who was certified as a meth lab technician in 2015 after the incident in this case, stated that it was impossible to store a spent meth lab as evidence because lithium was easily combustible when combined with water and that ammonium nitrate was "in itself . . . dangerous." When asked whether he would "recover things" from a meth lab by opening it and pouring the contents through a coffee filter, Detective Wear responded negatively and noted that "[t]hat's a good way to blow it up." The officers acknowledged that other than Sergeant Dockery's wearing gloves while handling the meth lab, they did not wear protective equipment during the search, although they opened the living room windows to increase ventilation.

Detective Wear stated that the items were not tested for fingerprints prior to their destruction; he noted that he did not feel a need to fingerprint any of the items because the Defendant and Mr. Jacobs lived at the trailer, and the items were spread through the trailer in plain view. It was not standard practice to test anything other than the liquid in an unspent meth lab and that that no such liquid was present in this case.

TBI forensic scientist Ashley Cummings, an expert in drug identification, testified that she analyzed some[7] of the pills taken from the Defendant's purse. The pills tested as thirty pseudoephedrine tablets, 17.07 grams[8] of marijuana in two plastic baggies, one oxycodone tablet, one dronabinol tablet, eleven alprazolam tablets, and nine hydrocodone tablets.

Upon this evidence, the Defendant was convicted as charged. A sentencing hearing was held on January 22, 2019.

After the conclusion of proof at the sentencing hearing, the trial court applied four enhancement factors to the Defendant—(1) the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (8) the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; (10) the Defendant had no hesitation about committing a crime when the risk to human life was high; and (13) at the time the felony was committed, the Defendant was released on bond. See Tenn. Code Ann. § 40-35-114. No mitigating factors were found to be applicable to the Defendant. See Tenn. Code Ann. § 40-35-113. Regarding consecutive sentencing, the trial court determined that the Defendant had an extensive record of criminal activity. See Tenn. Code Ann. § 40-35-115.

Ultimately, the trial court imposed an effective sentence of sixteen years in confinement. The trial court sentenced the Defendant as a Range II, multiple offender to twelve years for initiating the manufacture of methamphetamine, a Class B felony. She was also sentenced to eleven months and twenty-nine days for each of her simple possession convictions and for her drug paraphernalia conviction; all of which were to be served concurrently with her twelve-year sentence for initiating the manufacture of methamphetamine. Finally, relative to her possession of marijuana with the intent to sell, the trial court imposed a Range III, persistent offender sentence of four years for the Class E felony, and that four-year sentence was aligned consecutively to the twelve-year sentence for the methamphetamine conviction.[9]

---

[7] Ms. Cummings stated that TBI policy was to test three samples per case and that due to the unusual circumstances in this case, she tested five of the seven items submitted. It appears from the record that she did not test the second bag of ten suspected pseudoephedrine pills or a suspected dronabinol pill.

[8] Ms. Cummings noted that one-half of one ounce was 14.19 grams.

[9] At the sentencing hearing, the Defendant also received an agreed-upon four-year sentence in another case where she pled guilty to promoting the manufacture of methamphetamine. The trial court aligned that sentence consecutively to the sentences in this case because the Defendant committed that offense while on bond.

The Defendant's motion for new trial was denied. The Defendant timely appealed.

## ANALYSIS

The Defendant argues that (1) the trial court erred by denying the Defendant's motion to suppress the evidence seized as a result of the search of the Defendant's home; (2) the trial court erred by denying the Defendant's motion to dismiss for the State's failure to preserve material evidence and by declining to issue a special jury instruction; (3) the trial court erred by failing to instruct the jury on the lesser-included offense of facilitation of possession of marijuana with the intent to sell; (4) the trial court erred by admitting evidence of the Defendant's prior bad acts; (5) the State committed prosecutorial misconduct during closing arguments by commenting on the Defendant's intelligence; (6) the evidence was insufficient to support her convictions; and (7) the trial court erred in determining her sentencing range and by ordering partially consecutive sentencing. We will consider each issue in turn.

### I. Suppression

The Defendant contends that the trial court erred by denying her motion to suppress, arguing that the trial court made findings of fact not supported by the record, and accordingly, this court should reweigh its credibility determinations and find that the Defendant did not consent to the search and that the search exceeded the scope of any valid consent given when the officers searched the Defendant's purse and the composition notebook. The State responds that the trial court properly denied the motion to suppress.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Conversely, a trial court's conclusions of law, along with its application of the law to the facts, are reviewed de novo without any presumption of correctness. Id.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at

729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches [or seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007).

Before trial, the Defendant filed a motion to suppress the evidence obtained during the search, alleging that she did not give effective consent and, alternatively, that the officers' search exceeded the scope of her consent. At a June 16, 2017 pretrial motion hearing, Detective Wear testified consistently with his trial testimony. In addition, he stated that he and Deputy Graham were wearing street clothes and badges when they approached the trailer. Detective Wear was carrying a gun in a holster on his belt. Detective Wear did not recall whether he carried a taser, but he noted that the MPD officers in uniform would have carried one.

Detective Wear testified that the Defendant's trailer sat between twenty and thirty feet from the road and that he pulled his unmarked police truck into the driveway, but the other officers would have had to park on the street. He estimated that the officers had two unmarked vehicles and three marked police cruisers at the trailer. Detective Wear had not been to the trailer previously, although he had interacted with the Defendant and knew her.

Detective Wear testified that all MPD officers were issued "a Glock 45, 21, [an] AR-15," and a shotgun. He noted that he kept his guns in his police truck. Detective Wear stated that neither he nor Deputy Graham drew their weapons, verbally threatened the Defendant, or physically touched her.

Detective Wear stated that he arrived at the trailer at 10:30 p.m. and that he did not have a search warrant or proof of illegal activity. He said, though, that Deputy Graham told him that the Defendant had a meth lab. Detective Wear assumed that Deputy Graham obtained the information from a confidential informant. Detective Wear did not recall if Mr. Jacobs mentioned that the Defendant was asleep, but he allowed for the possibility. He acknowledged that he did not record his conversation with Mr. Jacobs.

Detective Wear testified that he spoke to the Defendant from her front porch and that both the front and screen doors were open. He stated that the Defendant responded to his questions and seemed "oriented to the conversation." Detective Wear did not recall the phrasing the Defendant used when giving consent for the search. Detective Wear stated that the Defendant was not under arrest at that time, that she was not handcuffed, and that none of the police vehicles had their lights or sirens activated.

Detective Wear did not remember telling Defendant that if she did not consent to the search, they would obtain a search warrant; asking the Defendant if all of the officers could enter; or asking Mr. Jacobs for consent to search. He stated his impression that the Defendant was the primary resident of the trailer. Neither officer conveyed to the Defendant that a confidential informant told Deputy Graham about a meth lab's being in her home.

Detective Wear denied smelling any fumes as he approached the trailer and spoke to the Defendant. Detective Wear stated that the items in the trailer were not found together and that he did not test the items for fingerprints.

Detective Wear testified that during the search, the Defendant was outside the house. He stated that until they found the one-pot meth lab, the Defendant was not handcuffed and was free to leave. He noted that they found the meth lab at the location Deputy Graham described within minutes of entering the home.

Detective Wear acknowledged that he was six feet, one inch tall and weighed 340 pounds, whereas the Defendant was a "small" woman and about five feet, six or seven inches tall. He said that the Defendant's front porch was small, that Officer Dockery stood at the foot of the porch, and that he and Deputy Graham stood on the porch at the front door.

Detective Wear acknowledged that in his police report, he did not refer to the Defendant's purse and that instead, he referred to items having been found in the Defendant's possession. Detective Wear stated that the officers observed marijuana in plain view inside the purse on the couch; he did not remember which of them found it. Detective Wear acknowledged that he never asked the Defendant for consent to search the purse or obtained a warrant to search the purse.

Detective Wear stated that an on-call magistrate was usually available and that it took between one and two hours to produce a warrant and ten minutes to drive to the magistrate's home. He denied attempting to obtain a search warrant based upon Deputy Graham's information, which was communicated the afternoon or evening before the search. Deputy Graham similarly did not attempt to obtain a warrant.

The Defendant also testified at the suppression hearing. She stated that on July 6, 2015, at about 5:30 p.m., she was asleep on the couch when the police came to her door "the first time," although she also referred to being awake at 10:30 p.m. The Defendant said that Mr. Jacobs came to the door from outside and told her that the police wanted to talk to her. The Defendant stated that as she "raised up" and tried to roll over and get up from the couch, Detective Wear, Deputy Graham, and Sergeant Dockery were standing

-10-

inside her front door. She denied having spoken to any of the officers previously. The Defendant stated that when she stood up and walked toward the door, Detective Wear said that they were going to "look in" the house and instructed the Defendant to sit back down on the couch. The Defendant stated that at this point, she was wearing her purse on her shoulder and that she sat down on the couch. According to the Defendant, Deputy Graham told her that he was going to move the coffee table and would not tell her why. When he moved the table, the Defendant saw a bottle that "[she] didn't know nothing [sic] about at all whatsoever."

The Defendant testified that when she was asleep, her purse was beside her on the couch. She stated that Detective Wear told her to stand up and go outside and that she placed the purse strap on her shoulder and walked outside. At some point thereafter, Detective Wear asked for the Defendant's purse; the Defendant intended to give the purse to her mother, who was "coming around the corner," but Detective Wear took it from her shoulder. The Defendant stated that the purse was zipped closed, "folded over and snapped." She affirmed that Detective Wear first opened the purse outside the home.

On cross-examination, the Defendant testified that she knew nothing about the meth lab under the coffee table. She acknowledged that the table was directly in front of the couch where she was sleeping. The Defendant stated that she did not know what was in the bottle, and she claimed to have never seen or "interacted with" meth labs before. The Defendant said that her prior methamphetamine convictions were only for "possession or something like that." When asked whether she was convicted in 2011 of promoting the manufacture of methamphetamine, the Defendant stated that she was charged with that offense, although she later acknowledged that she had, in fact, been convicted. The Defendant further acknowledged a previous conviction for possession of drug paraphernalia.

The Defendant testified that she was the sole owner of her purse and that she chose to take it outside during the search. The Defendant stated that although her mother owned the trailer, the Defendant and Mr. Jacobs lived there together. The Defendant said that she knew how to make soap from lye and brew beer, but that she was not in the practice of making them.

At a later hearing, the trial court made oral findings of fact and conclusions of law. The court noted that a factual dispute existed between Detective Wear's testimony that the Defendant came to the door, and the Defendant's testimony that she was asleep and awoke to the officers standing inside her living room. The court noted the "unreasonable police conduct" of conducting a knock and talk at 10:30 p.m. and the court's surprise that Detective Wear could not recall and had not documented the Defendant's words when

-11-

giving consent to search. The court also noted that the Defendant admitted to giving consent and that the ultimate issue was the voluntariness of the consent.

The trial court questioned the Defendant's credibility, noting that the Defendant's claim that she was sleeping on the couch with her purse on her shoulder was "highly improbable" and that it was "problematic" that the Defendant seemingly did not have the purse on her shoulder when she came to the door to talk to the officers. The court also noted the Defendant's testimony that she knew nothing about meth labs in spite of having prior methamphetamine-related arrests and "perhaps" convictions.

The trial court credited Detective Wear's testimony, noting that he candidly admitted to not having used a camera in spite of having one in his police cruiser and failing to include the details of the conversation in his reports. The court found that Detective Wear's "admission of what [the court] perceived to be sloppiness" lent him credibility and stated that it accredited Detective Wear's testimony over that of the Defendant. The court found that the Defendant freely and voluntarily gave consent without coercion.

Relative to the scope of the search, the trial court found that components of a meth lab could be secreted in a bag such as a purse and that although the Defendant could have limited her consent to the house excluding her purse, she "failed to do that." The court noted the State's argument that the marijuana in the purse was in plain view and stated that the court had no information about the purse's size and whether it was open. The court stated that it did not place "very much weight" on the plain view theory because "little things like a baggie full of a green plant material probably would fall to the bottom [of a purse] and get lost." The court noted that even if the Defendant was carrying her purse at the time of the initial search, once the meth lab was found, it could be searched incident to her arrest. The court mentioned the officers' "peculiar" decision to remove the purse from the house to search it in the Defendant's presence, but concluded that in light of the "extreme expectation of privacy" in a purse, it was precautionary. The court denied the motion to suppress.

In a subsequent written order denying the motion to suppress, the trial court reiterated that it resolved any factual dispute in the testimony in favor of Detective Wear, noting that the Defendant's cross-examination testimony "led this [c]ourt to find the testimony not to be credible," and that it relied on Detective Wear's testimony to find that the Defendant gave voluntary consent free from coercion. The court also found that because components of methamphetamine manufacture could fit in a purse, the Defendant's consent to search extended to her purse.

The trial court's determination that the Defendant voluntarily consented to the search turned on its finding that Detective Wear was more credible than the Defendant.

The Defendant points out in her appellate brief some of the court's oral findings of fact as evidence that the court abused its discretion by denying the motion to suppress. Although we agree that the court misstated some of the testimony—in particular, that the Defendant ever admitted to having given verbal consent to the officers and that the Defendant was wearing her purse while she was asleep—the record reflects that the court's credibility determinations were based upon facts supported by the hearing testimony. The court specifically cited Detective Wear's candor that he should have recorded his conversation with the Defendant. Similarly, the court found that the Defendant was not credible in part because she denied knowing anything about methamphetamine manufacture in spite of a past conviction for promoting methamphetamine manufacture. Because the court's credibility determinations were supported by the record, we conclude that the court did not abuse its discretion by finding that the Defendant gave effective consent for the search.

Relative to the scope of the search, we agree with the trial court that even if the officers had not seen marijuana in plain view in the Defendant's purse, it was a container that could have held smaller items used in methamphetamine manufacture—indeed, the Defendant had forty pseudoephedrine pills inside the purse—and that consequently, the purse was covered by the Defendant's initial consent. We also agree that even if we accepted the Defendant's account of having taken the purse outside the trailer with her, it was undisputed that the officers searched the purse after having found the meth lab, justifying a search for more methamphetamine-related items incident to the Defendant's arrest. The trial court properly denied the motion to suppress, and the Defendant is not entitled to relief on this basis.

Relative to the composition notebook, generally, grounds for a motion to suppress must be raised before trial unless "good cause" can be shown. See Tenn. R. Crim. P. 12(b)(2)(C). The record reflects that at trial, defense counsel objected to testimony regarding the ledger book, stating that he had not been notified of the notebook's existence until one week before trial. The primary objection appears to have been to laying an adequate foundation for the origin of the book and speculation as to the meaning of its contents, but counsel also argued that the notebook was outside the scope of the search.

The trial court agreed with defense counsel that books were not within the scope of a search for components of methamphetamine manufacture but then found that the Defendant did not object to the seizure of the book at the crime scene. The court noted that it did not know if the Defendant had the opportunity to object or whether she limited the scope of the search verbally at any point. The court finally stated, "I think it goes to the weight to be given this," and overruled the objection.

Regardless, in the motion for new trial, the Defendant only raised a general issue regarding the admission of testimony about the ledger book. At the motion for new trial

hearing, defense counsel framed the issue as a complaint that the police witness characterized the notebook as a ledger and that the witness connected it to drug transactions. Because the Defendant failed to raise a suppression issue related to the composition notebook at the motion for new trial, it has been waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Further, because the notebook or a copy of its pages are not included in the record on appeal, it is unclear what happened in the trial court, and plain error review is unwarranted. See State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (setting forth the required factors for plain error relief). The Defendant is not entitled to relief on this basis.

## II.     Ferguson

The Defendant contends that the trial court erred by denying her pretrial motion to dismiss on the basis of the State's failure to preserve evidence, arguing that because the Defendant disclaimed ownership of the items, some of the items were nonhazardous, and "[f]ingerprints taken from the meth lab components could have proven to be wholly exculpatory," the State had a duty to preserve them. Relatedly, the Defendant argues that the trial court erred by declining to issue a special instruction to the jury as a curative measure. The State responds that it was not required to preserve hazardous materials and that all of the destroyed evidence was potentially contaminated by the meth operation. Likewise, the State argues that no need for a special jury instruction existed.

In State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." State v. Merriman, 410 S.W.3d 779, 784 (Tenn. 2013) (citing Ferguson, 2 S.W.3d at 915-16). The court rejected a "bad faith" analysis in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." Id. at 785. Our supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." Id. at 784-85 (citing Ferguson, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence" and observed that the State's duty to preserve was "limited to constitutionally material evidence." Merriman, 410 S.W.3d at 785. The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (citing Ferguson, 2 S.W.3d at 915, 918). "If the trial court determines that the

State had a duty to preserve the evidence, the court must determine if the State failed in its duty." Id. (citing Ferguson, 2 S.W.3d at 917).

If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure: "(1) [t]he degree of negligence involved; (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) [t]he sufficiency of the other evidence used at trial to support the conviction." Merriman, 410 S.W.3d at 785 (quoting Ferguson, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." Id. at 785-86.

Before trial, the Defendant filed a motion to dismiss based upon the improper destruction of evidence, arguing that the meth lab bottle and its contents should have been subjected to fingerprints and chemical analysis. During the pretrial motion hearing on the motion to suppress, the trial court also received evidence relative to the Defendant's motion to dismiss. At the beginning of the hearing, the Defendant argued that the meth lab and its contents should have been tested to confirm the contents and obtain fingerprints from the exterior because the lab was no longer active and therefore no longer dangerous.

Detective Wear testified at the hearing that he had worked on the scene of about 100 meth labs before his September 2015 certification as a meth lab technician. He testified consistently with his trial testimony that many items at the Defendant's trailer were destroyed without having been fingerprint tested. Detective Wear described the spent meth lab and its contents consistently with Sergeant Dockery's trial testimony. He stated that the meth lab was in "a very volatile state" and that meth labs never became "safe as far as the chemical process," noting that lithium was highly combustible and that ammonium nitrate and camp fuel were dangerous. Detective Wear stated that the beer bottle gasser would have contained muriatic acid, another hazardous chemical, during the gassing process, although he did not note any substances in the gasser in the Defendant's bathroom.

Detective Wear acknowledged having sent liquid from a meth lab to be tested by the TBI in one instance occurring after the Defendant's case. Detective Wear noted, though, that the meth lab container itself was not preserved as evidence. Detective Wear stated that in the Defendant's case, the liquid had "already been pulled" from the meth lab. When asked why the entire bottle could not be sent to the TBI, Detective Wear responded that the bottle was "a bomb." Detective Wear stated that all of the seized items were destroyed that night after the methamphetamine task force officer responded to the scene,

-15-

although paraphernalia like "corner-cut baggies, three glass smoking pipes, digital scales, [and] razor blades" were retained as evidence.

Detective Wear affirmed that he advised the Defendant of her <u>Miranda</u> rights prior to the destruction of the meth-related evidence and that she denied ownership of the items. Mr. Jacobs was similarly advised and denied ownership of the items.

Due to a discovery oversight, the hearing was continued until September 19, 2017, to allow defense counsel to review crime scene photographs. During that hearing, Detective Wear was recalled as a witness and identified the crime scene photographs of the meth lab standing upright on the carpet, a closer angle of the meth lab, the coffee table with one of the pink makeup bags open, the coffee table showing the purple and pink striped bag zippered shut, the kitchen bar area with the box of Zephrex-D medication, and the kitchen stove area.

The hearing was continued again until February 27, 2018. At this hearing, the Defendant for the first time argued that the non-hazardous items in the house should have been preserved for testing. The trial court found that the pseudoephedrine box on the kitchen counter had "no value" to the meth lab and that the box could have contained exculpatory evidence such as fingerprints; the court noted, however, that the value was "slight" because multiple people touched items purchased at a store. The court stated that other similar pieces of evidence were "not inherently dangerous" and that it would consider those items using the <u>Ferguson</u> factors.

The trial court found that as a result of the search, the police discovered a scene "replete" with items involved in methamphetamine manufacture and that the police "chose not to collect and save" them. The trial court cited this court's decision in <u>Scott Benjamin Carroll, Jr. v. State</u>, No. M2015-00363-CCA-R3-PC, 2015 WL 8529464, at *6 (Tenn. Crim. App. Dec. 11, 2015), for the proposition that "if there [were] photographs of the meth components that those photographs . . . could be introduced and because of the hazardous contents of the meth lab that those photographs [were] a suitable alternative that should [have] come in." The trial court also noted <u>Carroll's</u> conclusion that "when evidence is just too dangerous to preserve . . . the State has no duty to preserve" it. The court acknowledged that the Defendant's case was different because the meth lab was "defunct" or "spent," but it found that common sense dictated that the remaining substances were corrosive, caustic, or otherwise hazardous. The court found that "those things such as the pseudoephedrine box [were] part and parcel" to the manufacturing process and that it was likely that all of the items were contaminated. The court also found that the crime scene photographs were a suitable alternative and that a <u>Ferguson</u> jury instruction was not justified. The court denied the Defendant's motion to dismiss. In a subsequent written order denying the motion to dismiss, the trial court found that the State had no duty to

preserve hazardous items and that because all of the items onsite were potentially contaminated and photographic evidence existed as a substitute, no Ferguson violation occurred.

After the close of the proof at trial, the Defendant requested a special jury instruction pursuant to Ferguson in light of Detective Wear's trial testimony about the various items destroyed by the methamphetamine task force. The trial court denied the request, finding that the relevant items "[had] been determined to be hazardous material" and relying on its reasoning in the pretrial motion to dismiss.

On appeal, the Defendant relies on this court's opinion in State v. Lonnie T. Lawrence and Patrick D. Pickett, No. E2007-00114-CCA-R9-CD, 2008 WL 704355, at *10-13 (Tenn. Crim. App. Mar. 17, 2008), abrogated on other grounds by Merriman, 410 S.W.3d at 790, for the proposition that the State has the duty to preserve untainted components from a meth lab site and that the Defendant's ability to test the untainted evidence for fingerprints was material to preparation of a defense. The Defendant names several photographed items and cites to Detective Wear's trial testimony regarding their safety as evidence that the items, some of which were sealed and in shopping bags from their purchase, could have been collected and fingerprinted. The Defendant also notes that in one photograph, an officer was holding one of the small pink bags in his bare hand, indicating that some things in the trailer were not contaminated by the meth lab.

The Defendant's case is distinguishable from Lawrence because the methamphetamine lab and associated components were not split between a shed and a residence but rather permeated a small living area. Importantly, the trial court in Lawrence relied upon officer testimony about the dangerousness or lack thereof of several destroyed items and made findings of fact that some of the items were uncontaminated. See 2008 WL 704355, at *11. The court also heard evidence that the disputed items could have been fingerprinted safely.

In contrast, in this case, the Defendant's initial motion to dismiss raised the destruction of the spent meth lab, and defense counsel only raised an argument about the other items in the house during arguments after Detective Wear's testimony was complete. Perhaps, due to the limited scope of the Defendant's motion, Detective Wear was not asked detailed questions about the safety of the individual items other than the contents of the meth lab bottle, and no one testified about the ability of the items to be fingerprinted other than to state that they had not been so tested. Although the trial court commented at the hearing that some of the items photographed were not inherently dangerous, its written order indicated that all of the items in the house were potentially contaminated and that the State had no duty to preserve them. "[T]rial courts speak through their written orders," and to the extent that the trial court's oral findings may conflict with its written order, we will

-17-

focus our review on the written order.  State v. Westley A. Albright, No. M2016-01217-CCA-R3-CD, 2017 WL 2179955, at *7 (Tenn. Crim. App. May 16, 2017), aff'd, 564 S.W.3d 809 (Tenn. 2018) (citing Williams v. City of Burns, 465 S.W.3d 96, 119 (Tenn. 2015)).  The record supports the court's finding that the State had no duty to preserve potentially contaminated evidence.  The Defendant is not entitled to relief on this basis.

### III.    Prior Bad Acts Evidence

The Defendant contends that the trial court erred by admitting evidence of her prior bad acts, specifically that the police came to the trailer because they had information that a meth lab was inside and that the composition notebook contained names of individuals who were involved in illegal drug activity.  She argues that the trial court did not follow the procedure prescribed in Tennessee Rule of Evidence 404(b); that the evidence was irrelevant to any material issue at trial because the police did not rely upon the information to enter the trailer; that the jury's guilty verdict in Count 5, possession of marijuana with the intent to sell, proves that the Defendant was prejudiced by the evidence because only a small amount of marijuana was involved; and that the trial court's curative instruction early in trial was insufficient to mitigate the prejudicial effect of the evidence given repeated references to it later in the trial.

The State responds that the Defendant has not adequately identified the evidence to which she objects; that the information prompting the police to visit the Defendant's trailer is not evidence of other bad acts, but rather the exact criminal activity leading to the Defendant's charges in this case; that the trial court sustained an objection to some of the testimony; and that the Defendant did not base objections to other specified testimony on Rule 404(b).

The admission of evidence of other bad acts by the Defendant is governed by Tennessee Rule of Evidence 404(b).  Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."  Tenn. R. Evid. 404(a).  To admit such evidence, the rule specifies four prerequisites:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

-18-

Id. When, the trial court substantially complies with the procedural requirements of Rule 404(b), this court will overturn the trial court's ruling only when there has been an abuse of discretion. See State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005).

At the beginning of Detective Wear's trial testimony, he stated that Deputy Graham conveyed to him that there was "a possible meth lab . . . at the residence of [the Defendant]." Defense counsel requested a bench conference and moved for a mistrial, arguing that the statement was hearsay and "evidence of another crime[.]" After the State responded that the statement was not offered for the truth of the matter asserted, defense counsel argued that the State should have requested a jury-out hearing before presenting evidence of another crime. The State responded that the evidence was not governed by Rule 404(b) because a possible meth lab was the crime being investigated. After a jury-out hearing in which the arguments were reiterated for the record, the trial court found that the evidence was not proof of a prior bad act. However, the court considered the matter further and noted that the "cleanest" way for Detective Wear to have communicated his reason for going to the trailer would have been to say that he received information from another officer without specifying what that information was.[10] Accordingly, the court issued a curative instruction to the jury to disregard the question and answer.

The Defendant identifies two other exchanges during trial in her appellate brief as improper testimony of prior bad acts. The first occurred during defense counsel's cross-examination of Detective Wear, when counsel asked him if he had "any personal knowledge of whether the ledger book had anything to do with meth, drugs, or [the Defendant's] maintaining her garden." Detective Wear responded, "Well, I can tell you that the names in the ledger book[,] at the same timeframe I was dealing with the same people referenced in illegal drug activity." Defense counsel requested a mistrial, and the trial court found that Detective Wear was responding to the question counsel asked. Defense counsel did not mention Rule 404(b) or other bad acts evidence during the bench conference and instead referred to the testimony as hearsay.

The second exchange occurred during Deputy Graham's direct examination, in which he stated that when Detective Wear and the Defendant conversed in her doorway, Deputy Graham "[w]itnessed conversation about their activity that had been going on at the residence." Defense counsel requested a bench conference and stated that Deputy Graham "did the same thing that [Detective] Wear did. Talked to her about activity that was going on at the residence[.]" Counsel noted that because Detective Wear had already

---

[10] The trial court stated several times that the statement was not offered for its truth, but also called Deputy Graham to testify during the jury-out hearing about his source of the information. The court concluded that Deputy Graham's information was unreliable because a confidential informant described an active meth lab when the Defendant's trailer only contained a spent meth lab.

testified about having gone to the trailer based upon Deputy Graham's information, Deputy Graham did not have to specify what kind of activity it was in order to create an inference of illegal activity. The trial court overruled the objection, finding that Deputy Graham had not violated the court's prior rulings. Similarly, counsel did not base his objection on Rule 404(b) on this occasion.

Because the Defendant did not make contemporaneous objections to the latter two exchanges on the basis of Rule 404(b), this issue has not been properly preserved for appeal and has been waived. See Tenn. R. App. P. 36(a). In addition, the Defendant's motion for new trial did not raise any issue with Detective Wear's testimony that the composition notebook contained names of other individuals involved in drug activity. The motion for new trial asserted that the trial court erred by allowing witnesses to reference the notebook as a ledger book. At the motion for new trial hearing, the Defendant specified that she was objecting to the law enforcement witnesses' characterizing the composition notebook as a ledger without further evidence that it was, in fact, a ledger. Issues may not be raised for the first time on appeal, and this issue has been waived. See Tenn. R. App. P. 36(a).

Throughout the trial, motion for new trial, and appeal, the Defendant has characterized Detective Wear's reference to Deputy Graham's information that a meth lab was possibly inside the Defendant's trailer as evidence of another "potential pending criminal case[]" or uncharged criminal conduct. However, as the State has correctly maintained throughout the proceedings, Deputy Graham's information clearly refers to the investigation that brought the officers to the Defendant's door. It was not another bad act—it was the offense for which the Defendant was on trial. The Defendant is not entitled to relief on this basis.

### IV.    Closing Argument

The Defendant contends that the prosecutor committed misconduct by commenting on the Defendant's intelligence during rebuttal argument. The State argues that the Defendant has waived consideration of this issue for failure to contemporaneously object and, alternatively, that the prosecutor was entitled to respond to the defense's entreaty to the jury to consider common sense and conclude that the Defendant did not know about the meth lab because she consented to the search.

Generally, the failure to lodge a contemporaneous objection during closing argument waives the issue on appeal. See State v. Jordan, 325 S.W.3d 1, 58 (Tenn. 2010); State v. Banks, 271 S.W.3d 90, 132 n.30 (Tenn. 2008); State v. Reid, 164 S.W.3d 286, 344 n.3 (Tenn. 2005) (appendix); State v. Reid, 91 S.W.3d 247, 284 (Tenn. 2002); State v. Larkin, 443 S.W.3d 751, 813 (Tenn. Crim. App. 2013); see also United States v. Young, 470 U.S. 1, 13 (1985) (the United States Supreme Court applying plain error review to

improper closing argument claims where neither party made a timely objection to preserve the issue for review). However, in State v. Hawkins, a death penalty case, the defendant raised four instances of alleged misconduct in closing statements, none of which drew a contemporaneous objection and only two of which were raised in the motion for new trial. 519 S.W.3d 1, 48 (Tenn. 2017). The Tennessee Supreme Court applied plenary review to the two issues raised in the motion for a new trial, one of which had been the subject of a previous motion in limine. Id.

The issue of whether a defendant is entitled to plenary or only plain error review of improper argument which was not objected to but was preserved in a motion for new trial is an issue currently before the Tennessee Supreme Court. See State v. Tyler Ward Enix, No. E2020-00231-CCA-R3-CD, 2021 WL 2138928, at *15 (Tenn. Crim. App. May 26, 2021), perm. app. granted (Tenn. Oct. 13, 2021). Regardless of whether we apply plain error or plenary review, the Defendant is not entitled to relief.[11] See State v. Charvaris Donte Newsom, No. M2020-00681-CCA-R3-CD, 2021 WL 1753409, at *19 (Tenn. Crim. App. May 4, 2021), perm. app. denied (Tenn. Sept. 22, 2021); State v. Martell Smith, No. M2019-01575-CCA-R3-CD, 2020 WL 6603467, at *7 (Tenn. Crim. App. Nov. 12, 2020), perm. app. denied (Tenn. Mar. 17, 2021) (both cases concluding that the defendant was not entitled to relief regardless of whether plain error or plenary review was applied to the statements from closing argument).

Our supreme court has consistently opined on prosecutorial misconduct regarding closing arguments as follows:

> The basic purpose of closing argument is to clarify the issues that must be resolved in a case. State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008). While "argument of counsel is a valuable privilege that should not be unduly restricted," Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975), "such . . . arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); see also State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 29.2, at 97 (2008), leeway should be given regarding the style and substance of the argument. Banks, 271 S.W.3d at 131; State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing

---

[11] We will engage in plenary review because it is the less onerous standard for the Defendant to meet and neither standard entitles the Defendant to relief. By doing so, we did not intend to imply that plenary review is the proper standard.

arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." Banks, 271 S.W.3d at 131.

State v. Sexton, 368 S.W.3d 371, 418-19 (Tenn. 2012).

The court has also advised that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. Banks, 271 S.W.3d at 131 (citing United States v. Young, 470 U.S. 1, 11-13 (1985); State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). "An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that if affected the outcome of the trial to the defendant's prejudice." Id. (citing Thacker, 164 S.W.3d at 244 (appendix); State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998)); see also Reid, 164 S.W.3d at 321.

As explained by our supreme court in Sexton, there are five general areas of potential prosecutorial misconduct related to closing argument:

(1) It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw. (2) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant. (3) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. (4) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. (5) It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Sexton, 368 S.W.3d at 419 (citing Goltz, 111 S.W.3d at 6 (citations omitted)); see also American Bar Association, Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 (1970). A prosecutor "should also refrain from calling the defendant derogatory names." State v. Carruthers, 35 S.W.3d 516, 578 (Tenn. 2000) (citing Cauthern, 967 S.W.2d at 737).

The record reflects that in closing, defense counsel stated the following:

. . . I want you to use your common sense. Let's start with that.

-22-

If as has been stated [the Defendant] knew everything that was going on in her house with these items that are right in front of the door, the short distance away and under the table and all over all this table and all over the kitchen cabinets and having an open purse on the couch that has marijuana sticking out of it, do you think . . . that if she knew what was there she would have said yes in any form or fashion that could have been construed to allow these officers into the house? Think about it. No keeps them out. Yes invites them into this world that they have where they saw all of these things she knew about. A meth lab, materials to make meth, a purse that has marijuana just hanging out of it. All of these that are plainly visible the minute you step through that doorway.

Defense counsel asserted throughout the remainder of his closing argument that had the Defendant known about the meth lab and its components, she would not have allowed the officers to search the trailer.

During the State's rebuttal, the prosecutor stated the following:

And [defense counsel] says use your common sense. If she knew that stuff was in her house, she would have never let them in. Well, we're not saying [the Defendant] was smart. We're not saying that [the Defendant] wasn't maybe using her pills she had in her pocketbook. But we are saying that she did consent to let these officers in her house. And there's no proof otherwise that she didn't do that.

After the jury retired to deliberate, defense counsel objected to the prosecutor's comment on the Defendant's intelligence and requested a mistrial. The prosecutor argued that the statement was a response to defense counsel's assertion that the Defendant could not have known about the items in her house if she gave consent. The trial court found that although the State's comment was "harsh," it was not unfairly prejudicial and did not rise to the level of necessitating a mistrial.

The record supports the trial court's determination that the State's remark was not so inflammatory as to affect the verdict to the Defendant's detriment. The evidence at trial overwhelmingly established the Defendant's guilt, either directly or by a theory of criminal responsibility; we note that defense counsel rigorously cross-examined the witnesses and that closing arguments were generally passionate in this case. Defense counsel relied heavily on the theme of common sense in his closing, and the State was entitled to respond to it. We do not think that any impropriety in the State's characterization of common sense as indicative of intelligence affected the verdict, and the Defendant is not entitled to relief on this basis.

## V.    Jury Instructions

The Defendant contends that the trial court erred by declining to instruct the jury on the State's duty to preserve evidence and facilitation as a lesser-included offense of possession of marijuana with the intent to sell.  The State responds that the jury was properly instructed.

A defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial."  State v. Brooks, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)).  "In criminal cases, a trial court's duty to accurately instruct the jury on relevant legal principles exists without request."  State v. Benson, 600 S.W.3d 896, 902 (Tenn. 2020).  "Questions involving the propriety of jury instructions are mixed questions of law and fact" which this court reviews de novo with no presumption of correctness.  Id. (citing  State v. Cole-Pugh, 588 S.W.3d 254, 259-60 (Tenn. 2019) (citing State v. Perrier, 536 S.W.3d 388, 396 (Tenn. 2017)).

In determining whether a jury instruction correctly, fully, and fairly sets forth the applicable law, we review the instruction in its entirety.  Id. (citing State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)).  "Phrases may not be examined in isolation." Id. (citing State v. Dellinger, 79 S.W.3d 458, 502 (Tenn. 2002)).  An instruction results in prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law."  State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

As we have discussed above, after the trial court indicated that it would instruct the jury on criminal responsibility, the Defendant requested that the court also instruct facilitation as a lesser-included offense.  The court responded that it did not believe the "evidence [was] legally sufficient . . . to support facilitation" or that a reasonable jury would find facilitation rather than criminal responsibility.  In support of this position, the court cited to State v. Robinson, 146 S.W.3d 469 (Tenn. 2004), in which our supreme court held that a facilitation instruction was not required when no reasonable jury could conclude that the defendant had the knowledge required for facilitation but lacked the intent required for criminal responsibility.

"A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility . . . , the person knowingly furnishes substantial assistance in the commission of the felony."  Tenn. Code Ann. § 39-11-403(a).  The facilitation statute applies to a person who provides substantial assistance in the commission of a felony, but who does so "without an intent to promote, assist in, or benefit from the commission of the felony." State v. Ely, 48 S.W.3d 710, 720 (Tenn. 2001).

-24-

Relative to Count 5, possession of marijuana with the intent to sell, the evidence at trial did not establish facts that would support a conviction for facilitation. The marijuana was found in the Defendant's purse, and no evidence indicated that Mr. Jacobs or another third party had access to the purse. We agree with the trial court that the proof did not suggest that the Defendant had provided substantial assistance to a third party's possession of marijuana with the intent to sell it, while also not intending to promote, assist in, or benefit from it.

## VI.    Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support her convictions for initiation of the manufacture of methamphetamine, simple possession of hydrocodone, oxycodone, and alprazolam, and possession of marijuana with the intent to sell,[12] arguing that we should consider only the evidence that would have been admitted if her motion to suppress the search of the trailer and her purse were successful, had her objections to "other bad acts" testimony been sustained, and had the trial court penalized the State for destroying evidence. In addition, she asks this court to reweigh the evidence and find that it was not adequately proven that the Defendant, instead of Mr. Jacobs, personally initiated the manufacture of methamphetamine. The State responds that this is not the correct standard of review.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "Regardless of the propriety of the admission of the challenged evidence, the sufficiency of the convicting evidence must be examined in light of all the evidence presented to the jury, including that which may have been improperly admitted." State v. Gilley, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008) (citing State v. Longstreet, 619 S.W.2d 97, 100-01 (Tenn. 1981)).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the

_____

[12] The Defendant does not dispute the sufficiency of the evidence relative to her possession of unlawful drug paraphernalia conviction.

-25-

evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

"It is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." Tenn. Code Ann. § 39-17-435(a). Initiates is defined as "to begin the extraction of an immediate methamphetamine precursor from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." Tenn. Code Ann. § 39-17-435(c).

Relative to this case, it is an offense to "knowingly possess" a controlled substance. Tenn. Code Ann. § 39-17-418(a). Hydrocodone and oxycodone are Schedule II controlled substances; alprazolam is a Schedule IV controlled substance. Tenn. Code Ann. §§ 39-17-408(b)(1)(F), (M); -17-412(c)(2). "[A] person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b).

It is also an offense to possess a controlled substance with the intent to sell it. Tenn. Code Ann. § 39-17-417(a)(4). Marijuana is a Schedule VI controlled substance. Tenn. Code Ann. § 39-17-415(a)(1).

"Possession may be actual or constructive." State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981). Constructive possession occurs when a person knowingly has the "power and the intention at a given time to exercise dominion and control over an object, either directly or through others." Id. (quoting United States v. Craig, 522 F.2d 29 (6th Cir. 1975)). The mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs. State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987) (citations omitted). However, as stated above, circumstantial evidence alone may be sufficient to support a conviction. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). Further, it is permissible for the jury to draw an inference of intent to sell or deliver when the amount of the controlled substance and other relevant facts surrounding the arrest are considered together. Tenn. Code Ann. § 39-17-419.

The State correctly observes that our sufficiency review is based upon the evidence presented to the jury regardless of its admissibility. See Gilley, 297 S.W.3d at 763. In the light most favorable to the State, the evidence at trial established that after the Defendant consented to the police search of her trailer for evidence of methamphetamine manufacture, officers found in the living room, kitchen, and bathroom a multitude of items used to manufacture and package methamphetamine. In particular, the area of the coffee table directly beside where the Defendant claimed to have been sleeping contained lithium batteries that had been taken apart, empty boxes of pseudoephedrine allergy medication, new and drained cold packs, digital scales, plastic corner-cut baggies, pliers, scissors, a spent one-pot meth lab containing byproducts of a completed methamphetamine cook, razor blades, coffee filters, a funnel, and bags containing camp fuel, multiple bottles of lye, small makeup bags containing drug paraphernalia, and plastic tubing. The kitchen and bathroom also contained components of methamphetamine manufacture and were set up to facilitate a methamphetamine cook. The Defendant and Mr. Jacobs were the only people inside the trailer, and the jury was instructed on criminal responsibility. The jury heard ample testimony from the police officers about the purpose of the items inside the house, and defense counsel cross-examined them at length about perceived deficiencies in the investigation. The jury also heard from Detective Wear that the Defendant denied knowing anything about the meth lab and asserted that someone planted it underneath the coffee table while she was asleep. By the guilty verdict, the jury discredited this theory. Credibility determinations are the province of the finder of fact and will not be disturbed on appeal. See Bland, 958 S.W.2d at 659. The evidence is sufficient to support the Defendant's conviction for initiation of methamphetamine manufacture.

Likewise, after the meth lab had been discovered, the police searched the Defendant's purse after seeing two baggies of marijuana in plain view; they discovered a number of different kinds of pills in plastic baggies. Subsequent testing of some of the pills revealed that they were alprazolam, hydrocodone, oxycodone, and pseudoephedrine. The marijuana was confirmed during testing as well. The police witnesses noted that the digital scales in the trailer also contained a leafy residue and that the almost identical size of the two baggies of marijuana were consistent with their being intended for resale. The evidence is sufficient to support the Defendant's convictions for simple possession of alprazolam, hydrocodone, and oxycodone, and for possession of marijuana with the intent to sell. The Defendant is not entitled to relief on this basis.

*VII. Sentencing*

The Defendant contends that the trial court erred by sentencing her as a Range II, multiple offender for the Class B felony conviction of initiating the manufacture of

methamphetamine[13] and for ordering consecutive service of the twelve-year sentence for initiating the manufacture of methamphetamine and the four-year sentence for possession of marijuana with the intent to sell.[14] Relative to consecutive sentencing, she argues that many of her prior convictions occurred more than twenty years ago, that several convictions were based upon behavior occurring within one week, and that she developed a drug addiction following the end of an abusive marriage and the death of her young daughter. The Defendant notes that the trial court in rendering its sentencing ruling urged the Defendant to seek treatment while incarcerated and start fresh upon release. According to the Defendant, due to her substance abuse problem, she would benefit from a treatment program, rather than an extended period of incarceration. The State responds that the trial court did not err in determining the Defendant's range classification and did not abuse its discretion in ordering consecutive sentences.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40- 35-114; (6) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; (7) any statement the defendant wishes to make on the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length, range, or manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012); see also State v. Joseph Cordell Brewer, III, No. W2014-01347-CCA-R3-CD, 2015 WL 4060103, at *7-8 (Tenn. Crim. App. June 1, 2015) (applying an abuse of discretion standard to trial court's determination of range classification). This standard of review also applies to consecutive sentencing determinations. State v. Pollard, 432 S.W.3d 851, 860-61 (Tenn. 2013).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-

---

[13] The Defendant does not challenge her Range III classification relative to her possession of marijuana with the intent to sell conviction.

[14] The Defendant likewise does not challenge the imposition of the consecutive sentencing of this case with her agreed-upon four-year sentence in the other case where she pled guilty to promoting the manufacture of methamphetamine.

10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

To be considered as a Range II, multiple offender for a Class B felony conviction, a defendant would have to have at least two prior convictions "within the conviction class, a higher class, or the next two (2) lower felony classes." Tenn. Code Ann. § 40-35-106(a)(1). In determining the number of prior convictions, "convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction," except where "the statutory elements include . . . threatened bodily injury to the victim or victims." Tenn. Code Ann. § 40-35-106(b)(4). A trial court must determine beyond a reasonable doubt that the defendant has the requisite number of prior felony convictions to qualify as a Range II offender. Tenn. Code Ann. § 40-35-106(c).

In addition to the presentence report, the State introduced several certified copies of judgments of conviction for felonies at the sentencing hearing. Five of those judgments of conviction reflected felony convictions committed on five different offense dates: in Blount County for promoting the manufacture of methamphetamine on January 31, 2011 (a Class D felony); and in Monroe County for sale of a counterfeit controlled substance on April 9, 1996 (a Class E felony); sale of Schedule IV drugs on February 24, 1996 (a Class D felony); sale of more than 0.5 ounces of marijuana on February 20, 1996 (a Class E felony), and sale of cocaine in an amount less than 0.5 grams on February 18, 1996 (a Class C felony). Accordingly, the trial court did not err in concluding that the Defendant had the requisite convictions for sentencing as a Range II, multiple offender for purposes of her conviction for initiating the process of manufacturing methamphetamine.

Next, when reviewing a trial court's imposition of consecutive sentences, a "presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." Pollard, 432 S.W.3d at 861. "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

The imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2), (4). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive

sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Pollard, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1)) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal."); see also Bise, 380 S.W.3d at 705.

Here, the trial court found that the fifty-two-year-old Defendant had an extensive criminal record. See Tenn. Code Ann. § 40-35-115(b)(2). In addition to the five felony convictions noted above, the State also introduced certified copies of judgments and various documents reflecting multiple misdemeanor convictions. Trial courts can consider prior misdemeanors in determining whether a defendant has an extensive record of criminal activity because Tennessee Code Annotated section 40-35-115(b)(2) does not distinguish between felonies and misdemeanors. See Dickson, 413 S.W.3d at 748 n.12.

Those judgments and documents entered reflected that in Monroe County, the Defendant had February 2017 convictions for shoplifting, criminal trespass, theft under $500, driving on a suspended license, driving without insurance, and three counts of simple drug possession; a September 2010 conviction for shoplifting; a January 2009 conviction for driving under the influence ("DUI"), second offense[15]; a February 2009 conviction for disorderly conduct; a November 2007 conviction for disorderly conduct; a July 2000 conviction for driving on a revoked license, second offense; a July 1999 conviction for DUI, second offense; a May 1998 conviction for DUI; a June 1998 conviction for public intoxication; a February 1996 conviction for public intoxication; October 1996 convictions for public intoxication and possession of drug paraphernalia; a January 1995 conviction for public intoxication; and a May 1993 conviction for leaving the scene of an accident. In addition, the Defendant in Loudon County had November 2010 convictions for failure to appear and two counts of simple drug possession and November 2007 convictions for violating the open container law and reckless endangerment.

The trial court noted the multiple convictions that had been presented at the sentencing hearing reflecting the Defendant's criminal history of felonies and misdemeanors. The record clearly supports the application of the extensive criminal history factor for consecutive sentencing. While many of the Defendant's prior felony convictions may have been from 1996, she had one new felony conviction in 2011. Moreover, she had twelve misdemeanor convictions since 2010. Though the trial court did urge the Defendant to seek treatment for her drug problem while incarcerated, this statement did not somehow negate the validity of its consecutive sentencing determination. The trial court also commented that it could not allow "that treatment to be in the

---

[15] This was initially charged as the Defendant's third offense but was later amended to a second offense for reasons that are unclear from this record.

community" and had to protect society from further criminal conduct by the Defendant. Based upon the Defendant's criminal history, the overall sentence was reasonably related to the severity of the offenses involved in this case. Accordingly, the trial court did not abuse its discretion in imposing partial consecutive sentences based on the Defendant's extensive criminal record.

## VIII.  Clerical Error

Our review of the record indicated that the judgment form in Count 1, initiation of the manufacture of methamphetamine, does not have a box checked reflecting that the offense is methamphetamine related. Upon remand, the trial court should enter a corrected judgment for Count 1 with the aforementioned box checked.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed. However, we remand the case for the entry of a corrected judgment in Count 1.

_____
D. KELLY THOMAS, JR., JUDGE